NASIR ABDUL-ALI
a/k/a DONALD RAY REED,                                                PETITIONER

V.                                                               NO. 4:05CR045-GHD

UNITED STATES OF AMERICA,                                         RESPONDENT

## MEMORANDUM OPINION

This matter comes before the court on Petitioner's motion to vacate pursuant to 28 U.S.C.

§ 2255. The Government has responded. An evidentiary hearing was held and the parties have filed

supplemental briefs. After due consideration, the court finds that the petition should be denied in

all respects.

### A. Factual and Procedural Background

In 1992, the Petitioner was convicted of conspiracy to distribute cocaine, aiding and abetting

the distribution of cocaine, the use of a firearm, aggravated assault of a federal officer, possession

of a firearm by a previously convicted felon, and possession of a firearm with an obliterated serial

number. The Petitioner was sentenced to 168 months imprisonment and was released in 2004.

Within months of his release, the Petitioner was again facing federal charges for drug trafficking.

On January 13, 2005, agents of the North Central Narcotics Task Force arranged for a

confidential informant–who was later identified as Johnnie Mae Bell–to purchase cocaine from the

Petitioner. Bell was provided buy money and Deputy Gene Luster accompanied her to a

convenience store where she placed a phone call to the Petitioner's cell phone. About this same

time, Agent Anthony Jones was conducting surveillance and observed the Petitioner leave a

residence at 100 February Street in Belzoni, Mississippi along with a young black male later

identified as Tony Taylor. Agent Jones followed the Petitioner and Taylor to a service station where Agent Jones saw the Petitioner meet with Bell and make some transaction. Agent Jones then followed the Petitioner and Taylor back to the residence on February Street.[1] Deputy Luster meet with Bell where she turned over crack cocaine which had been purchased from the Petitioner.

On the following day, Agent Jones prepared an affidavit along with the incorporated underlying facts and circumstances and made application for a warrant. Agent Jones appeared before a Humphreys County Justice Court Judge, was placed under oath, and related the details of the drug purchase. Based on Agent Jones' observation of the Petitioner departing and returning to 100 February Street before and after the drug buy, and based on the reasonable assumption that the Petitioner may have a supply of similar narcotics at the home, the Judge issued a warrant authorizing a search of the residence at 100 February Street and all appurtenances thereto.

The warrant was executed on the same day, January 14, 2005. The search resulted in the discovery of marijuana, marijuana growing materials, cocaine, scales, baggies, and cutting agent in a bedroom where the Petitioner had his clothes and other personal effects[2] including a bill in his name. Outside, in dog food containers located next to a dog pen, agents found approximately seven ounces of powder cocaine and eight ounces of crack cocaine. The agents also recovered $100 of their buy money from the Petitioner's front pocket.

On March 23, 2005, the Petitioner was indicted for, *inter alia*, possessing with intent to distribute in excess of 50 grams of crack cocaine. On July 13, 2005, the jury returned a guilty verdict on all four counts of the indictment. Due in large part to his prior criminal history, the Petitioner was

---

[1] As will be discussed in greater detail *infra*, whether or not Agent Jones followed the Petitioner back to February Street is subject to some debate.

[2] Whether or not the items in the home belonged to the Petitioner was also the subject of debate and litigated fully.

sentenced to life imprisonment. An appeal was perfected. The conviction and sentence were affirmed on April 2, 2007. The Petitioner filed a *pro se* motion for relief from judgment under Rule 60. Later with the assistance of counsel [3] and without objection, the court granted the Petitioner additional time to file a 2255 motion. The motion was filed on September 8, 2008.

In his motion, the Petitioner asserts three distinct grounds for habeas relief. The Petitioner's arguments for relief include:

| | |
|---|---|
| Ground One | Suppression of Evidence; Due Process Clause of the Fifth Amendment and Confrontation Clause of the Sixth Amendment. |
| Ground Two | Ineffective Assistance of Counsel in violation of the Sixth Amendment. |
| Ground Three | Cumulative Error of *Strickland* and *Brady*. |

An evidentiary hearing was held on October 8, 2009, regarding the Petitioner's claim based on the alleged withholding of *Brady* material an issue intertwined in each of the Petitioner's Grounds for relief. Additionally, each Ground for relief contains sub-arguments which will be extracted in the following discussion.

## B. Standard for Review

After a defendant has been convicted and exhausted or waived any right to appeal, "a court is entitled to presume that [he] stands fairly and finally convicted." *United States v. Willis*, 273 F.3d 592, 595 (5th Cir. 2001). Accordingly, relief under 28 U.S.C. § 2255 is "reserved for transgressions of constitutional rights and for a narrow range of injuries that could not have been raised on direct appeal and would, if condoned, result in a complete miscarriage of justice." *United States v. Gaudet*,

---

[3] Trial counsel was Nick Crawford. Attorney Jackson Williams represented the Petitioner during appeal and throughout these collateral proceedings.

81 F.3d 585, 589 (5th Cir. 1996). Once a sentence of imprisonment has been imposed, the court's authority to reduce or modify the sentence is limited. *United States v. Lopez*, 26 F.3d 512, 515 (5th Cir. 1994). A criminal defendant seeking relief from his conviction or sentence in a motion to vacate pursuant to § 2255 must therefore establish one of the following: (1) his sentence was imposed in violation of the Constitution or laws of the United States; (2) the sentencing court lacked jurisdiction to impose the sentence; (3) the sentence imposed exceeded the maximum authorized by law; or (4) the sentence is otherwise subject to collateral attack. *United States v. Seyfert*, 67 F.3d 544, 546 (5th Cir. 1995).

## C. Discussion

### Ground One: The *Brady* Violation

Ground One is essentially a *Brady* claim based upon the discovery of an affidavit which potentially impeaches the testimony of Agent Jones. Through his own efforts, the Petitioner discovered a search warrant executed by Agent Jones on January 13, 2005, for Kenny Golden[4] and his residence which was located in Holmes County. The Golden warrant was executed by Agent Jones on January 13, 2005, at approximately 11:58 a.m. in Tchula, Mississippi. At the Petitioner's trial, however, Agent Jones testified that on January 13, 2005, at approximately 11:45 a.m. he was following the Petitioner in Belzoni, Mississippi. The testimony and the Golden affidavit places Agent Jones in two cities approximately 15 miles apart at essentially the same time which suggests that Jones has provided false information–either at trial or in the Golden matter. In either event, the Petitioner argued that the Golden warrant could have been used to impeach the credibility of Agent

---

[4] Other than the fortuitous timing, Kenny Golden or the Golden matter is in no way associated with the facts and circumstances of this case.

Jones. The Petitioner acknowledged, however, that the prosecution did not actually possess or have knowledge of the Golden search warrant.

The Government countered that there was ample testimony at trial which corroborated Agent Jones' testimony with regard to his involvement in the investigation and eventual arrest of the Petitioner. At the evidentiary hearing, the Government further offered that it was entirely possible for Agent Jones to have conducted the controlled buy from the Petitioner and then to have participated in the Golden search. Hence, the Golden affidavit does not impeach Agent Jones' testimony.

As noted *supra*, an evidentiary hearing was held regarding the Golden search warrant. At the hearing, Agent Jones testified that he did in fact supervise the controlled buy with Bell and the Petitioner on January 13, 2005. Then at the conclusion of that transaction, Agent Jones stated that he drove at speeds in excess of 100 miles per hour to the Golden residence and participated in that search on the same day. Jones explained that the time noted on the executed Golden warrant is accurate in contrast to his trial testimony in this matter which were estimations of time.

The United States Supreme Court has held that the Due Process Clause guaranteed by the Fourteenth Amendment requires the prosecution to produce, upon request, evidence favorable to the accused material to either guilt or punishment. *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). The prosecution's good faith or lack thereof is immaterial to the inquiry.*Id.* The *Brady* standard applies when (1) the prosecution withholds evidence (2) that is favorable to the defense because it is exculpatory, or because it is impeaching, and (3) the evidence is material. *Kyles v. Whitley*, 514 U.S. 419, 432-34, 115 S. Ct. 1555, 1565-66, 131 L. Ed. 2d 490 (1995). Evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the

result of the proceeding would have been different. *DiLosa v. Cain*, 279 F.3d 259, 263 (5th Cir.

2002); *United States v. Bagley*, 473 U.S. 667, 682, 105 S. Ct. 3375, 3383, 87 L. Ed. 2d 481 (1985).[5]

A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Kyles*,

514 U.S. at 434.

When the testimony of the witness, who might have been impeached by the undisclosed

evidence is strongly corroborated by additional evidence supporting a guilty verdict, the undisclosed

evidence generally is not found to be material. *United States v. Sipe*, 388 F.3d 471, 478 (5th Cir.

2004). Conversely, if the impeaching evidence would seriously undermine the testimony of a key

witness on an essential issue or there is no strong corroboration, the withheld evidence has been

found to be material. *Id.* at 478 (citations omitted). When a Petitioner fails to establish any element

of *Brady*, the court need not inquire into the other components. *United States v. Runyan*, 290 F.3d

223, 245 (5th Cir. 2002). The prosecution, however, is not required to produce exculpatory evidence

that is fully available to the defendant or that could be obtained through reasonable diligence. *May

v. Collins*, 904 F.2d 228 (5th Cir. 1990).

Foremost, it is above dispute that the Government did not possess the executed Golden

warrant. The Government denies any prior knowledge of the Golden matter. This fact alone seems

to foreclose the Petitioner's *Brady* claim. The Petitioner, however, cites a case from the First

Circuit, *United States v. Osorio*, 929 F.2d 753, 761-62 (1st Cir. 1991), which he relies upon for the

---

[5] The *Kyles* court articulated four elements defining the contours of "material evidence." "First, materiality does not require the defendant to demonstrate by a preponderance of the evidence that omitted evidence would have resulted in acquittal. Second, he need not weigh the withheld evidence against the disclosed evidence to show he would have been acquitted by the resulting totality. Third, if evidence is found material, there is no need to conduct a harmless error analysis. Fourth, the withheld evidence should be considered as a whole, not item-by-item." 514 U.S. at 434-37.

proposition that the Government is to be held accountable for the failure to disclose impeaching information known to its informants and investigators.

It is true that the knowledge of investigators may be imputed to the prosecution. *See United States v. Antone*, 603 F.2d 566, 569 (5th Cir. 1979). In certain circumstances, the prosecution's failure to disclose impeaching information known to investigators or others may warrant a new trial. *Giglio*, 405 U.S. 150, 153, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972) (information known to attorney who did not try the case).[6] In this case, however, the issue is more easily disposed by reviewing the nature of the information allegedly suppressed.

As attested to during the trial, there can be no doubt that Agent Jones participated in the controlled buy which led to the arrest and conviction of the Petitioner. As revealed in the evidentiary hearing, after the conclusion of the controlled buy, Agent Jones also participated in the search of the Golden property on the same day. Furthermore, at the hearing, Officer Luster confirmed Agent Jones' participation in the controlled buy. Officer Luster explained that the controlled buy took no more than thirty minutes from start to finish making the time frame for corresponding estimations very narrow. Although the precise time these events took place cannot be conclusively established, the court does not believe that Agent Jones testified falsely as the Petitioner had hoped the Golden

---

[6] In *Giglio* the trial prosecutor had no knowledge of a promise of leniency made to the government's key witness by another prosecutor in the office. *Id.* The case depended almost entirely on the key witness's testimony. *Id.* At trial, this witness falsely denied the promise. *Id.* The Supreme Court reversed the conviction, finding that the prosecutor's failure to reveal the promise denied the defendant a fair trial. *Id.* A *Giglio* violation usually involves the nondisclosure of any understanding or agreement as to a future prosecution of a key witness. *See United States v Williams*, 343 F.3d 423, 439 (5th Cir. 2003).

Similarly, in *Kyles*, the Supreme Court stated that a prosecutor has a duty to learn of any exculpatory evidence known to others acting on the government's behalf. 514 U.S. at 436-36. A prosecutor "should know" of evidence in the possession of police officers who are investigating the case, and other government agencies involved in the investigation. *Id.*

warrant would establish. The executed Golden warrant simply demonstrates that Agent Jones' estimation of the time the controlled buy occurred and the events that followed on January 13, 2005, was imprecise.

The Golden warrant is not exculpatory and its impeaching value, if any, is extremely slight particularly in light corroborating testimony and the narrow time frame. If the Golden warrant had been made available to the defense at trial, it would have done nothing more than serve the redundant purpose of showing that Agent Jones' approximations of time were "approximate." The Golden warrant does not render Agent Jones' testimony false. The executed Golden warrant is neither exculpatory or impeaching. Accordingly, the court finds that the Government did not withhold *Brady* evidence that was actually or constructively–through Agent Jones' knowledge–in its possession. The Petitioner's *Brady* claim is therefore denied.

Ground Two: Ineffective Assistance of Counsel

When a defendant collaterally attacks his conviction or sentence based on the effectiveness of his counsel, he has the burden of proving by a preponderance of the evidence that his constitutional rights have been violated. *Johnson v. Zerbst*, 304 U.S. 458, 469, 58 S. Ct. 1019, 82 L. Ed. 1461 (1938); *Bruce v. Estelle*, 536 F.2d 1051, 1058 (5th Cir. 1976). In order to demonstrate ineffective assistance of counsel, a defendant must satisfy the two part test of *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984):

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

8

A petitioner must satisfy *both* prongs of the *Strickland* test to succeed. *Id.* at 687.

a.    *Failure to Adequately Prepare for Trial*

The Petitioner first asserts that Attorney Crawford was inadequately prepared for trial because he waited to meet with his client two days prior to the "omnibus hearing"[7] which was held one week prior to trial. The argument continues, that because Crawford waited so long to meet with the Petitioner he was ill prepared to address the "possession of the house."

At trial, the main defense was that the Petitioner did not live at 100 February Street where the drugs were found. The Petitioner has set forth an impressive argument attempting to demonstrate that he did not reside at 100 February Street but instead lived with this mother nearby at 108 March Street. The issue of exactly where the Petitioner lived, however, was plainly submitted and thoroughly argued before the jury. Trial Tr. Lizzie Reed, 258-73, 286-94; Velma Morris, 307-29; Charles Harris, 182-83, 385-87; James Regan, 388-89; Cleveland Ross, Jr., 381-82; Tilden Washington, 330-33, 342-45; Tony Taylor, 353-54; Agent Anthony Jones, 198-200, 203-04, 214-19, 224, 228-29, 232-33; Mary Nolden, 138-39, 144, 152-55; Jeff Overstreet, 158-65.

Suffice it to say that nearly every witness either for the Government or the defense was questioned at length regarding whether or not the Petitioner lived at 100 February Street. Predictably, defense witnesses consistently stated that the Petitioner lived with his mother at 108 March Street while the Government's witnesses maintained that he lived or at least appeared to reside at 100 February Street. Choosing to believe the Government's witnesses, the jury found that the Petitioner was in possession of the drugs that were seized at 100 February Street. The

---

[7] Presumably the Petitioner is referring to the hearing held June 27, 2005, regarding his motion to suppress. An opinion denying the motion was entered on June 29, 2005. Trial began on July 5, 2005.

presentation of additional testimony on the issue would have been cumulative.

The Petitioner also suggests that Attorney Crawford failed to present documentation which would have rebutted the Government's proof regarding residency and possession. Specifically, the Petitioner offers that Humphreys County High School records would have revealed that he lived at 108 March Street; that the Petitioner's driver's licence, tag registration and W-2[8] reflected that he resided at 108 March Street; and, that the United States Probation Office records contained the 108 March Street address for the Petitioner. While these demonstrative exhibits would have provided additional support for the defense, it would not have obliterated the Government's strong showing that the Petitioner at least maintained some control over the 100 February Street address. These documents also do not dispute the admission that the Petitioner had, at some point, officially resided at the home where the drugs were found.

The question then becomes was Attorney Crawford's assistance deficient because he failed to present additional evidence refuting the Petitioner's presence at the home. The issue of possession of the 100 February Street residence was thoroughly presented by to the jury and decided adversely to the Petitioner. Although not without missteps, the court finds that trial counsel's performance was not constitutionally deficient for failing to present cumulative evidence regarding whether or not the Petitioner lived at 100 February Street.

b.    *Failure to Impeach the confidential informant*

Next, the Petitioner argues that trial counsel was deficient for failing to impeach the credibility of the confidential informant, Johnnie Mae Bell. The Petitioner submits that Bell testified she was an informant "out of love for her daughter–she testified that her daughter had purchased

---

[8] The W-2 provided actually has a post office box rather than a street address.

drugs from" the Petitioner. The theory continues that defense counsel should have verified this with testimony from Bell's daughter, Andrea Ceasar. Specifically, the Petitioner now offers an affidavit from Ceasar indicating that she never met the Petitioner and that she never bought drugs from him.[9]

First, it is questionable whether the court would have permitted the defense to call a witness solely to impeach the character of another witness on a collateral point.[10] *See* Fed. R. Evid. 608(b); *United States v. Posada-Rios*, 158 F.3d 832, 870 (5th Cir. 1998) (no right to impeach a witness with respect to collateral or irrelevant matters). The court, furthermore, has good reason to give little credence to Ceasar's proposed testimony. *See* n.9. Perhaps trial counsel did as well particularly after defense witness, Tony Taylor, was impeached with a video tape that was secretly recorded by the Petitioner's relatives. Decisions such as whether or not to call a particular witness are relegated to the discretion of trial counsel. *Murray v. Maggio*, 736 F.2d 279, 282 (5th Cir. 1984) (claims involving failure to call a witness are not favored in federal habeas review). A decision not to call Ceasar, especially given the prior impeachment of Taylor, falls within the category of trial strategy. *United States v. Cockrell*, 720 F.2d 1423, 1427 (5th Cir. 1983). The failure to call Ceasar only to

---

[9] The affidavit is handwritten and was witnessed by Lizzie Reed, the Petitioner's mother. Ms. Reed's involvement is noteworthy because during the trial a video tape was entered into evidence. Trial Tr. 371 Ex. D9-A. The tape was used to impeach the testimony of defense witness Tony Taylor who admitted that he sold Bell the drugs on January 13, 2005. The same drugs which provided the basis for the issuance of the search warrant for the February Street residence. Petitioner's relatives, including his mother, arranged a meeting with and secretly taped Taylor admitting that he sold the drugs to Bell. At the end of the meeting, Taylor received "some item" from the relatives. By receiving something of value (presumably money) in exchange for his statement, the Government theorized that Taylor's "confession" was a staged attempt to exonerate the Petitioner.

[10] The fact that the Petitioner may or may not have sold Ceasar drugs in the past is irrelevant to his conviction for possession. It is also irrelevant with regard to whether or not he sold drugs to Bell during the controlled buy on January 13, 2005.

impeach Bell[11] was reasonable. The Petitioner has failed to overcome the presumption afforded to counsel's decision not to call Ceasar as a witness. *Cf. Roberts v. Dretke*, 356 F.3d 632, 638 (5th Cir. 2004) (when a defendant–or by extension his family–sabotages an attorney's efforts to mount a defense, he cannot later claim ineffective assistance of counsel).

    c.    *Failure to impeach Agent Jones*

The Petitioner next takes issue with defense counsel's failure to impeach Agent Jones' testimony. The argument contains two parts. First, the Petitioner complains that Agent Jones gave conflicting testimony about whether he followed the Petitioner from the gas station where the controlled buy took place back to the 100 February Street residence. Fruther, that trial counsel failed to impeach Agent Jones' credibility with the conflicting testimony. The Petitioner believes this to be an important point since his mother lived within sight of the 100 February Street address. Secondly, that defense counsel failed to adequately cross-examine Agent Jones regarding his identification of the Petitioner from his location while conducting surveillance near the 100 February Street residence.

    (1)    Conflicting testimony regarding following the Petitioner

At the suppression hearing, Agent Jones first testified that he "met up with [the confidential informant and deputy Luster]" after the controlled buy transaction was completed. Supp. Hrg. 43:14-25 (Jun. 27, 2005). He was then asked if "anybody follow[ed] the defendant to find out where he was going" after the buy. Agent Jones answered, "[n]o." *Id.* at 23-25. Next, Agent Jones was asked

---

[11] It should also be noted that Bell's character was not above reproach. There was ample unflattering testimony at trial regarding Bell's character for truthfulness or lack thereof. Defense counsel even argued the point in closing. Trial. Tr 433:18-20, 434:14-23, 437:23-25, 438:1-8, 440:5-11.

to read from a supplemental report prepared for the prosecution. *Id.* at 48:8-18. The supplemental report recounted the details of the controlled buy. The report, prepared by Agent Jones, specifically stated "I continued to follow Donald Ray Reed after the transaction back to his residence at 100 February Street, Belzoni, Humphreys County, Mississippi. At no time did Donald Ray Reed stop while en route to his residence." *Id.* at 49:19-22. Agent Jones was later asked to clarify whether he followed the Petitioner back to 100 February Street. His response was, "[w]ell, I followed him back to the location where he would be in sight of his residence. Then I just went on to keep him from noticing that I was behind him." *Id.* at 51:2-6.

At trial under cross-examination, Agent Jones testified that he "went back en route behind Mr. Donald Ray Reed back to February Street and viewed that he was headed back to 100 February Street" Trial Tr. 224:2-9. Yet again, Agent Jones was asked the question "[d]id you follow that red Camaro all the way back to 100 February Street?" *Id.* at 228:24-25. Agent Jones stated, "I followed them back and–directly back towards the street until I can identify and say that he's going back home." *Id.* at 229-1-3. Defense counsel pressed Agent Jones, "[s]o you didn't follow him all the way?" Agent Jones elaborated, "I didn't follow him back to his doorstep, no, sir, because I didn't want him to know that I was following him." *Id.* at 229:4-6.

Clearly, Agent Jones was having some difficulty providing a direct answer to the often asked question. Defense counsel did not specifically use Agent Jones' prior testimony from the suppression hearing for impeachment, but he did repeatedly quiz Agent Jones about whether or not he followed the Petitioner back to 100 February Street. Given the frequency with which this issue was addressed by both the Government and the defense, the impeachment value of Agent Jones'

prior statements would have likely been minimal.[12] Particularly here where Agent Jones was asked the same question numerous times and each time provided slightly differing responses. The purported "conflicting testimony" was evident. Therefore, the court does not find that defense counsel performance was deficient or that the failure to use the prior testimony would have yielded a different result.

(2)     Cross-examination regarding identification of the Petitioner

Next, the Petitioner suggests defense counsel ineffectively cross-examined Agent Jones with regard to the identification of the Petitioner as he departed 100 February Street. Specifically, the Petitioner argues that shrubs would have obscured Agent Jones' view of the February Street home as well as the identity of anyone leaving in an automobile. The Petitioner avers that defense counsel should have "argued that it was unbelievable that Agent Jones could identify " anyone leaving the house from his vantage point. The Petitioner offers an affidavit from Donnie Williams, his sister, to verify this assertion.

Again, defense counsel explored the identity issue with Agent Jones during trial. Defense counsel carefully questioned Agent Jones about the logistics of his surveillance of 100 February Street. Agent Jones was steadfast in his ability to see and identify the Petitioner and Taylor leaving the home. Trial Tr. 214-19:1-10; 234-35. Contrary to the Petitioner's argument, defense counsel did argue that Agent Jones' identification should be viewed with speculation. Trial Tr. 444:22-25;

---

[12] This issue is also intertwined with the element of "possession,"–that is, who was in possession or control of the 100 February Street home. Understandably an important point for the defense, since the search warrant was issued for this residence and a large quantity of drugs and paraphernalia were found in and around the home. While the Petitioner devotes a substantial portion of his brief to the issue, whether or not Agent Jones followed the Petitioner back to 100 February Street adds almost no exculpatory value. And, when viewed in a light most favorable to the verdict, there was ample evidence apart from the "did he follow or did he not" dispute to support the jury verdict.

14

445. In any event, the court finds that defense counsel's performance in this regard was not deficient. The court further finds that the proposed introduction of Williams' testimony adds nothing to the defense and likely would not have resulted in a different outcome. Defense counsel's failure or refusal to call the Petitioner's sister as a witness was not unreasonable.

### d. Failure to Rebut Supplemental Discovery

The Petitioner complains that defense counsel should have asked for a continuance to gather rebuttal evidence when the Government, within days of the trial, supplemented discovery with an Entergy invoice and letter addressed to the Petitioner at 100 February Street. The Petitioner now offers an affidavit from his brother explaining that the utilities at the home have been in the name of "Donald Ray Reed" since 1992 despite the repeated insistence that the Petitioner did not live there during this time period. This fact, however, was sufficiently addressed by other witnesses at trial including Velma Morris and Lizzie Reed. Trial Tr. 319:9-25, 320:1-15; 272:1-25. Proffering testimony from yet another relative regarding the utility bill would have been cumulative. Accordingly, defense counsel's decision not to call an additional witness to rebut the Entergy invoice was entirely reasonable and falls within the ambit of strategy.[13] *See Bower v. Quarterman*, 979 F.3d 459, 470 (5th Cir. 2007) (the issue of requesting a continuance is a strategic decision that is "virtually unchallengeable") (citations omitted).

### e. Failure to Object to Hearsay

At trial, Chuck Harris and James Regan each provided testimony that Lizzie Reed said her

---

[13] The Petitioner also reasserts that other documentation, such as W-2, drivers' license, and probation records, could and should have been offered to rebut the Entergy bill and letter addressed to Donald Ray Reed at 100 February Street. As discussed in greater detail *supra*, the issue of possession and control over the residence was fully litigated and submitted to the jury. Although the introduction of independent documentation would have been relevant, their absence does not cause the court to question the fairness of the trial and the reliability of the verdict.

son lived at 100 February Street. Trial Tr. 385:14-25, 386:1-7; 388:1-18. The Petitioner contends that defense counsel failed to challenge their statements as hearsay. The Petitioner recognizes that even over an objection the officers could have nevertheless referred to the statements for their impeachment value and not for the truth asserted–that Donald Ray Reed lived at 100 February Street.

Assuming *arguendo* that defense counsel should have objected to the hearsay testimony of the two officers, the Petitioner must still overcome the prejudice prong of *Strickland*. When a defendant receives at least some meaningful assistance, he must prove prejudice in order to obtain relief for ineffective assistance of counsel. *Goodwin v. Johnson*, 132 F.3d 162, 176 n.10 (5th Cir. 1997). "Bad lawyering, regardless of how bad, does not support" a presumption of prejudice. *Gochicoa v Johnson*, 238 F.3d 278, 284-85 (5th Cir. 2000) (citations omitted). The court finds it dubious that a hearsay objection and instruction regarding impeachment value of the officers' statements would have resulted in a different outcome given the overwhelming evidence against the Petitioner. *Green v. Johnson*, 160 F.3d 1029, 1040 (5th Cir. 1998); *see also Jordan v. Wilkinson*, 244 Fed. Appx. 581, 2007 WL 2253474 at *1 (5th Cir. Aug. 7, 2007). Although entirely proper, the interjection of an objection likely would not have altered the verdict.

Ground Three: Cumulative Error

Finally, the Petitioner argues that when combined all these errors justify relief. Federal habeas relief is only available for cumulative errors that are of a constitutional dimension. *Coble v. Quaterman*, 496 F.3d 430, 440 (5th Cir. 2007). Meritless claims cannot be cumulated, regardless of the total number raised. *Pondexter v. Quaterman*, 537 F.3d 511, 525 (5th Cir. 2008). As extensively discussed *supra*, the Petitioner has failed to establish any constitutional error. Though his claims are numerous, none of them rise to the level of a constitutional violation. He has not

16

established an ineffective assistance claim under *Strickland* or a claim under *Brady*, nor shown an evidentiary error which resulted in an unfair trial or one which undermines confidence in the verdict. The cumulative argument, therefore, fails.

### D. *Conclusion*

For all the foregoing reasons, the Petitioner's motion to vacate will be denied. The claims neither singularly or collectively are sufficient to warrant federal habeas relief.

A final judgment shall issue in accordance with this opinion.

This the _____ day of December, 2009.

SENIOR JUDGE
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF MISSISSIPPI